IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA    )
                            )
       vs.                  )     Case No. 05 CR 471 - 26
                            )
ANTHONY HARDMON             )

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Anthony Hardmon is charged with narcotics and firearms offenses. Hardmon was arrested inside his home on May 25, 2005. A search was conducted of the home, resulting in the recovery of two handguns and suspected narcotics.

Hardmon has moved to suppress the fruits of the search. The government contends the search was justified because Hardmon's wife, Tiffany Hardmon, voluntarily consented to the search. Hardmon contends that Mrs. Hardmon's consent was not given until after the search had begun, and that in any event her consent was given involuntarily.

For the reasons stated below, the Court grants Hardmon's motion to suppress.

### Facts

In finding the facts, the Court has assessed the credibility of each of the witnesses. We did not find any of the witnesses to be entirely credible or entirely lacking in credibility. Some witnesses testified to events that the Court is not persuaded actually took place; others denied events that the Court is persuaded occurred. After giving due consideration to all the evidence and assessing the credibility of each witness, the Court finds the facts as follows.

Sometime before May 25, 2005, a warrant was issued for Hardmon's arrest. Around 6:30

a.m. on May 25, 2005, a team of law enforcement officers arrived at Hardmon's home in Cicero, Illinois to effectuate his arrest. The officers chose that early hour to ensure that Hardmon would be at home, as well as to have the element of surprise. The officers' intention was to arrest Hardmon and to search his residence. Because the officers did not have a search warrant for the home, it was understood that consent would be required to permit a search.

The team assigned to execute the warrant consisted of approximately fifteen law enforcement officers, all armed, from the Chicago Police Department and other jurisdictions. After everyone was in place, one of the officers, Chicago police officer Jeff Jablon, "pound[ed] wildly" on the front door (his own words) while shouting for the occupants to open the door. The Hardmons – defendant Anthony Hardmon, his wife Tiffany Hardmon, and their three children, ages 13, 10, and 6 – were still asleep and were awakened by the noise. After a short delay, Hardmon approached the door, wearing only boxer shorts. Jablon was able to see Hardmon through the glass in the front door.

Jablon directed Hardmon to open the interior door. Hardmon did not immediately do so, because he needed a key to unlock the door from the inside, and he first had to retrieve the key. Hardmon advised the officers of this through the door, but it is not clear whether Jablon understood what he was saying. When Hardmon walked away from the door to get the key, Jablon directed other officers to force the door open.

An officer with a battering ram forced open the front door. The glass in the front door shattered, spraying broken glass into the interior of the house. Once the door had been forced, at least six officers rushed in, and more followed. All of them had weapons drawn. At the time of entry, Hardmon had put on a pair of pants and was standing in the hallway opposite the door.

2

The officers forced him to lie on the floor, face down.  Hardmon was immediately handcuffed and taken to the living room.

As the officers rushed into the house, Mrs. Hardmon and the three children were standing in the doorway to a bedroom watching; the children were "hollering and screaming."  An officer pushed Mrs. Hardmon away from where her husband was standing and back into the bedroom.  She and the children were ordered to get down onto the floor, and they complied.  The children continued to scream.  A female officer, likely Sergeant Patricia Casey, came into the room and told them to calm down.

While Mrs. Hardmon and the children were being ordered to lie down, other officers were swarming throughout the house, conducting a "protective sweep," checking in rooms and closets, under beds, and in other places to determine if anyone else was present.  Mrs. Hardmon saw and heard this taking place.  The distinction between a "sweep" and a "search," though well-known to police officers, lawyers, and judges, was likely lost on her; she perceived, reasonably, that her home was being searched by as many as nine law armed enforcement officers, all of whom had guns drawn.  One or more officers entered the room where Mrs. Hardmon and the children were lying, with their guns still drawn because they still were not certain whether anyone else was in the home.  Though none of the officers purposely aimed their guns at Mrs. Hardmon or her children, because they were on the ground Mrs. Hardmon reasonably perceived that guns were pointed in their direction.

The Court finds that although Mrs. Hardmon was never placed under arrest or told that she was under arrest, she was in custody at the time she was asked to consent – in the sense that a reasonable person in her position would not have believed she was free to leave.  *See, e.g.,*

3

*United States v. Scheets,* 188 F.3d 829, 836-37 (7th Cir. 1999). She had been physically directed into a small room in the house by an officer with a drawn firearm; other officers with drawn firearms came into the room; an officer (Sgt. Casey) entered the room, stayed there with Mrs. Hardmon and her children, and told them to calm down; the entire house had been occupied by armed police who were freely proceeding through all areas of the house; and she were not, under the circumstances, free to leave or even move about the house.

While the "sweep" was still in progress, Sergeant Casey allowed Mrs. Hardmon and the children to get up off the floor. She asked Mrs. Hardmon who she was and asked to see identification. Casey retrieved Mrs. Hardmon's purse from another room and asked Mrs. Hardmon to get her identification out. After looking at the identification, Casey asked Mrs. Hardmon whether there were any guns in the home. Mrs. Hardmon replied that there were two handguns, one in the attic and another in a bedroom closet. Other officers were present in the room when Mrs. Hardmon reported this information. Upon learning where the guns were, one officer, boosted by another, climbed into the attic crawl space to find one of the guns, and another officer went to the bedroom to locate the other one.

After the officers found the two handguns, a consent to search form was presented to Mrs. Hardmon, and she was asked to sign the form. As this was happening, other officers were continuing to go through the various rooms of the home. Mrs. Hardmon was not advised that she had the right to refuse to sign. Mrs. Hardmon testified that she asked what would happen if she did not sign, and that a female officer (likely Sergeant Casey) replied that if she did not sign, she would be taken into custody and her children would be put in foster care. The Court is not persuaded of the veracity of this aspect of Mrs. Hardmon's testimony.

4

In addition to the handguns, officers recovered vials containing suspected narcotics, and they identified an area in the basement that looked like it might have been used to conceal contraband. This likely happened after Mrs. Hardmon signed the consent form.

**Discussion**

When the government seeks to justify a search based on consent, it bears the burden of proving by a preponderance of the evidence that consent was given, and that it was given voluntarily. *See, e.g., United States v. Villegas,* 388 F.3d 317, 325 (7th Cir. 2004). Consent is involuntary if the will of the person who gave the consent was "overborne and [her] capacity for self-determination [was] critically impaired." *Schneckloth v. Bustamante,* 412 U.S. 218, 225 (1973). Specifically, consent is invalid and does not justify a search if it is coerced by threats or force, or granted only in submission to a claim of lawful authority. *Id.* at 233.

In determining whether consent to search has been given voluntarily, courts consider the age, education, and intelligence of the person who gave the consent, whether she was advised of her constitutional rights, the length of detention (if any) prior to consent, whether consent was given immediately or only after repeated requests, whether the person was physically coerced, and whether she was in custody. *See, e.g., United States v. Strache,* 202 F.3d 980, 985 (7th Cir. 2000).

Mrs. Hardmon is a person of better than average intelligence; she had worked for an armored security company in the past, carrying a firearm at work, and at the time of the search she was working as a manager at a discount department store. She was not advised, either verbally or in writing, of her right to refuse consent – though we hasten to note that the giving of such advice is not the *sine qua non* of voluntary consent. *Schneckloth,* 412 U.S. at 249; *United*

5

*States v. White,* 979 F.3d 539, 542 (7th Cir. 1992). Mrs. Hardmon signed the consent form within minutes after the officers entered the home, and there is no evidence that repeated requests for consent were made. The consent form, as we have noted, stated that "I have not been threatened or forced in any way" and that "I freely consent to the search." Mrs. Hardmon's execution of this form is a significant factor supporting the claim of voluntariness. *See, e.g., United States v. Taylor,* 31 F.3d 459, 463 (7th Cir. 1994).

At the time Mrs. Hardmon signed the consent form, however, there is no question that she was in custody. Though she was not handcuffed, she had been ushered into a small room along with her children, and officers with drawn weapons then entered the room and stayed with her. She was initially ordered to lie on the floor. There is absolutely no question in the Court's mind that Mrs. Hardmon believed she was not free to leave, and that a reasonable person in her position would not have felt free to leave. *See, e.g., United States v. Withers,* 972 F.2d 837, 841 (7th Cir. 1992).

The fact that Mrs. Hardmon was in custody at the time she was asked to sign the consent form is a significant factor undercutting the government's claim of voluntariness, but it is not by itself sufficient to render her consent involuntary. *See, e.g., United States v. Watson,* 423 U.S. 411, 424 (1976); *Strache,* 202 F.3d at 986. What is perhaps more significant is the fact that by the time Mrs. Hardmon was asked to consent, the search had already begun and had already borne fruit (the recovery of the handguns). Mrs. Hardmon was aware of these facts, and she was also cognizant of the fact that a large number of armed law enforcement officers were, and had been, moving through her home at will, with weapons drawn, searching every room as part of the sweep. Under the circumstances, the Court finds that Mrs. Hardmon's consent was, in the words

of the Supreme Court in *Schneckloth,* "granted only in submission to a claim of lawful authority." *Schneckloth,* 412 U.S. at 233.

In sum, Mrs. Hardmon gave consent after the search had begun and after significant items had been recovered. She acted after being placed in a coercive environment that resulted from the law enforcement officers' forced and violent entry into her home; the presence of numerous armed officers who were moving at will throughout her home; the fact that they forced her and her children into a small room where they were required to lie on the floor; and the fact that the officers appeared not to require her consent to proceed with their search. For these reasons, the Court finds that the government has not carried its burden of showing by a preponderance of the evidence that Mrs. Hardmon gave voluntary consent to the search of the home.

**Conclusion**

For the reasons stated above, the Court grants defendant Anthony Hardmon's motion to suppress [docket no. 252]. The fruits of the May 25, 2005 search of Hardmon's residence are excluded from evidence at trial.

    /s/ Matthew F. Kennelly
MATTHEW F. KENNELLY
United States District Judge

Date: March 20, 2006